In the
United States Court of Appeals
For the Seventh Circuit

No. 01-3275

Scavenger Sale Investors, L.P.,

Plaintiff-Appellant,

v.

Robert Anthony Bryant,

Defendant-Appellee.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 99 C 3355--Morton Denlow, Magistrate Judge.

Argued April 8, 2002--Decided April 30, 2002


   Before Bauer, Easterbrook, and Williams,
Circuit Judges.

   Easterbrook, Circuit Judge.  Scavenger
Sale Investors put up $2 million for
Robert "Tony" Bryant to use in buying tax
certificates at Cook County's 1997 sale.
The county sells certificates to real
estate encumbered by unpaid tax liens.
The County gains because the back taxes
are paid by the proceeds of the sale; the
buyer of a certificate can make money if
the owner redeems it by paying the back
taxes (plus interest) to the certificate
owner, or by selling the property once
the redemption period has expired. Under
the loan agreement, Bryant was to repay
the principal and interest by December
21, 1998. When he did not pay, Scavenger
Sale Investors filed this suit on the
note under the diversity jurisdiction.
(Bryant is a citizen of Illinois;
Scavenger Sale Investors' partners are
citizens of New Jersey, Pennsylvania, or
California.) The district court, acting
through a magistrate judge after consent
under 28 U.S.C. sec.636(c), rejected
Bryant's defenses to payment and granted
summary judgment to Scavenger Sale
Investors, leaving open final calculation
of the unpaid balance. At this point the
parties settled their differences. They
agreed that the amount due was $1.6
million and that the district court would
enter a judgment for that sum (plus

interest at 15%, a substantial reduction from the 40% rate in the note) unless Bryant promptly paid $1 million (plus interest at 12%) under a formula recited in the agreement.

Scavenger Sale Investors preferred $1 million in hand to the uncertain prospect of collecting $1.6 million through citation proceedings. Bryant preferred the discount to his chances on appeal. (He could have challenged the grant of summary judgment and attempted to win outright, though with what hope of success we do not know.) When Bryant stopped making the scheduled payments, Scavenger Sale Investors asked the district court to enter the judgment for $1.6 million, as the settlement agreement provided. Bryant then welshed on his promise, as well as on his payments, and asked the court to give him the benefit of the $1 million option even though he had not satisfied its conditions.

Relying on Checkers Eight Limited Partnership v. Hawkins, 241 F.3d 558 (7th Cir. 2001), the magistrate judge concluded that an obligation to pay $1.6 million on account of failure to pay $1 million would be a "penalty" forbidden by Illinois law--and it is state law that governs the interpretation and enforcement of settlements in diversity litigation. See Kokkonen v. Guardian Life Insurance Co., 511 U.S. 375 (1994); Jessup v. Luther, 277 F.3d 926 (7th Cir. 2002). The district court entered judgment for $1 million (less payments already made).

On this appeal Scavenger Sale Investors asks us to overrule Checkers and hold that settlement agreements are exempt from the anti-penalty rule of contract law, as several state courts have held. See, e.g., Crosby Forrest Products, Inc. v. Byers, 623 So. 2d 565 (Fla. App. 1993); Resolution Trust Corp. v. Avon Center Holdings, Inc., 832 P.2d 1073 (Colo. App. 1992). But Checkers is a recent decision, no Illinois court has indicated skepticism about its holding, and until some post-Checkers development suggests that Illinois agrees with Colorado and Florida, it would be inappropriate for us to retread this ground.

Still, it is essential to determine

whether a given difference in the amount due is a "penalty." The district court characterized the $1.6 million agreed judgment as a $600,000 "penalty" for Bryant's failure to pay $1 million. Why not say instead that the $1.6 million was what Bryant owed on the note, and that the $1 million option was a "discount" for prompt payment, sparing Scavenger Sale Investors the need to locate and seize his assets? Everything depends on which end of the telescope one looks through. In contract law a "penalty" is a payment that exceeds a reasonable estimate of the loss from breach. E. Allan Farnsworth, III Farnsworth on Contracts sec.12.18 (2d ed. 1998). Determining whether a liquidated-damages clause is a penalty can be hard for the same reason the parties thought it hard to calculate actual damages in the first place: what's the benchmark against which the stipulated damages will be compared to determine whether they are a penalty? Here the magistrate judge used $1 million as the benchmark, but this amounts to saying that all settlements entail penalties, because parties resolve their dispute for some fraction of the original claim. Parties settle litigation with the expectation that, if the deal falls through, each side retains its legal entitlements. A judgment in the amount of the original legal entitlement can't be called a "penalty" for the collapse of the settlement; it is instead the non-penalty benchmark. So, here, the benchmark is the original stakes of the suit ($1.6 million accruing 40% annual interest). Did this settlement agreement provide for a penalty compared with Scavenger Sale Investors' entitlements under Bryant's 1997 note? The answer must be no. We think it most unlikely that Illinois would deem collection of the full overdue balance on a note to be an unenforceable penalty.

Whether a settlement is a discount--or instead the greater judgment that results from failure to settle is a penalty--is an old dispute in litigation, but usually heard in criminal rather than civil cases. A defendant who pleads guilty usually receives a lower sentence (often a much lower sentence) than a person who stands trial and is convicted of the same charges. Is the lower sentence a discount for saving the prosecutor's resources (and foregoing all chance of acquittal),

or is the higher sentence following trial a penalty for the exercise of constitutional rights? The answer always given is that the penalty imposed following trial is the lawful benchmark, so that the lesser sentence for one who pleads guilty is a discount. See, e.g., United States v. Klotz, 943 F.2d 707 (7th Cir. 1991); United States v. Turner, 864 F.2d 1394, 1398-99 (7th Cir. 1989); United States v. Long, 823 F.2d 1209, 1211-12 (7th Cir. 1987). This means that if the plea bargain collapses the sentence may exceed the original agreement without penalizing the exercise of any constitutional right. See Alabama v. Smith, 490 U.S. 794 (1989); Bordenkircher v. Hayes, 434 U.S. 357 (1978).

   Applying this principle to civil cases means that no sum less than or equal to the judgment that would be entered following a trial may be called a "penalty." The outcome of litigation is the lawful benchmark. Any lower settlement is a discount, and to insist that the full amount (that is, the probable judgment) be paid if the settlement falls through is not to insist on or collect a "penalty" by comparison to the party's original legal entitlements. In Checkers it was harder to determine the likely outcome of trial, and the parties never attempted to do so. Checkers sought about $550,000 for breach of contract, and defendants filed a counterclaim for about $1.2 million. The plaintiffs' loss was easier to calculate than the defendants'; the judge fixed the plaintiffs' entitlement at $380,000, and while the defendants' entitlement (if any) was up in the air the parties settled for a net payment of $250,000 to plaintiffs. The agreement provided that the amount would jump to $400,000 if timely payments were not forthcoming. We held that this structure created a penalty. The $400,000 exceeded not only the $250,000 discount offered in settlement but also the $380,000, and though this was the district judge's estimate rather than a final figure the plaintiffs did not try to show that recovery likely would have been higher. Even $380,000 net in plaintiffs' favor was possible only if the counterclaim were worthless. This may be why the parties to Checkers never argued that the stakes of litigation should be used as

the benchmark. But in this case they have made such an argument--it is built into the settlement agreement, which quantifies the unpaid balance at $1.6 million--and when that outcome can be determined it is a benchmark superior to the discount offered as part of the settlement.

In contract law a court asks whether liquidated damages reasonably approximate the actual damages from breach; in settlement cases we ask whether the full payment provided in the event the settlement falls through reasonably approximates the damages that the court was likely to provide had the case been litigated to conclusion. Here the agreed judgment of $1.6 million plus 15% interest from the date of the settlement is less than the likely judgment of $1.6 million plus 40% interest, the contractual rate. This is not a penalty under ordinary contract principles. Anexample makes this clear. A holds B's note for $1 million. A prefers cash in hand to the chore of locating, seizing, and selling B's assets and makes B an offer: for $750,000 paid the next day, A will give B a release. The parties reduce this agreement to writing. B does not pay but argues that his maximum liability now is $750,000--which A must collect by locating, seizing, and selling assets. B insists that the settlement reduces the debt to $750,000, with a "penalty" of $250,000 for nonpayment. Yet that would be a silly way to understand the transaction--and it would bring an end to settlements of financial disputes, because it would deprive creditors of the benefit of such bargains. Instead the note establishes A's entitlement to $1 million, and only a demand for more could be a penalty. Just so here. Bryant is liable on a note, and only an agreement to pay more than the sum due on that note (plus interest) could be a penalty.

There remains the possibility that a $1.6 million judgment would penalize Bryant by denying him credit for the more than $750,000 that he paid toward the $1 million settlement. The agreed judgment does not provide one way or the other for the handling of sums already paid. This silence led the magistrate judge to say that it denies Bryant any credit for his payments. In that event the judgment would indeed create a penalty; Scavenger

Sale Investors' take would exceed the amount it could have received by prosecuting the litigation to conclusion. But there is no good reason to read silence in a draft judgment as denying Bryant credit for payments made toward the balance on the note. Silence is the norm in judgments, which recite the prevailing party's legal entitlement rather than the balance of an account. A judgment debtor always receives credit for any sums paid by him or third parties. See Restatement (Second) of Judgments sec.50(2) (1982). Nothing in this judgment suggests a departure from that norm. So Bryant receives credit toward the $1.6 million (plus 15% interest) for all payments he has made since the settlement of April 2000, when the $1.6 million figure was calculated, and Scavenger Sale Investors is entitled to the remainder. Bryant loses the opportunity to challenge on appeal the summary judgment decision, obtaining in return a reduction in the interest rate (from 40% to 15% per annum). It is a normal commercial settlement, not a penalty, and should have been enforced by the district court.

The judgment is reversed, and the case is remanded with instructions to enter the judgment agreed by the parties in April 2000.